## MALIC v. FOX et al.

### No. 14,883; June 9, 1893.

#### 33 Pac. 441.

Agency—Estoppel of Principal.—A Bond Given to the Owner of a Boat, conditioned to pay for all goods delivered to F., as steward of the boat, was executed by the sureties' bookkeeper without authority. In an action thereon by one who had furnished goods to F., it appeared that the bond was executed June 15th; that plaintiff had commenced furnishing goods June 1st, on F. agreeing to pay on the 15th of each month, and had furnished goods to the value of

$100 before the bond was executed; that on June 30th, when $237 was due, and F. refused to pay, plaintiff declined to furnish more goods but afterward, when F. showed him the bond, he continued to let F. have goods, but made no inquiry of the sureties as to the genuineness of the bond until after the goods sought to be recovered for were furnished. Held, that plaintiff did not deliver the goods to F. relying on the bond, "in good faith, and without ordinary negligence," within the meaning of Civil Code, section 2334, providing that only in such case is "a principal bound by the acts of his agent under a merely ostensible authority."

APPEAL from Superior Court, City and County of San Francisco; F. W. Lawler, Judge.

Action by Charles M. Malic against C. G. Fox, W. F. Witzemann, and John J. Staiger. Plaintiff had judgment, from which, and an order denying a new trial, defendants Witzemann and Staiger appeal. Reversed.

Henry N. Clement for appellants; W. H. Barrows for respondent.

VANCLIEF, C.—Action to recover from the defendant, Fox, and his guarantors, Witzemann & Staiger, copartners, the sum of $431.29, for goods sold and delivered to Fox by plaintiff's assignor, one H. A. Smith, who did business under the name of "Smith's Cash Store." The action is founded upon a written guaranty of Witzemann & Staiger to the San Francisco and North Pacific Railroad Company, a corporation, which owned and navigated the steamer "James M. Donahue," in connection with its road, to transport passengers across the bay of San Francisco, given under the following circumstances: In the latter part of May, 1889, Fox applied to the railroad company for the position of steward of the steamer "James M. Donahue," with the privilege of keeping a restaurant thereon for passengers and employees, and was informed by the agent of the company (H. C. Whiting) that he could be appointed to the position only on the condition that he would give a bond with satisfactory sureties that he would pay all bills contracted by him for goods and supplies for said restaurant. Upon his promise to give the required bond or guaranty, Fox was appointed to and took the position

June 1, 1889, but did not give the bond or guaranty until June 15, 1889, when he gave the following instrument:

"We, the undersigned, do hereby severally and jointly guaranty the full and complete payment of all bills, dues, and claims arising from the purchase of goods, wares, and merchandise by C. G. Fox, by himself, or order, to be used on or for the steamer 'James M. Donahue,' for boarding passengers or employees of the San Francisco and North Pacific Railroad Company; and we severally agree to pay all bills contracted by said Fox or his agent for goods, wares, and merchandise delivered on the steamer 'James M. Donahue,' to be used by him or others as aforesaid, upon presentation to us, or either of us; and we further agree and guaranty that the said steamer 'James M. Donahue,' and the said San Francisco and North Pacific Railroad Company, owners thereof, shall be forever held harmless by reason of any purchase or contracts made by said Fox or his agents for the purposes before named. In case said Fox shall neglect or refuse to pay any or all the bills so contracted, we hereby agree severally to pay the said bills promptly upon presentation, according to the terms of said purchase.

"Witness our hands, this 15th day of June, A. D. 1889.

"WITZEMANN & STAIGER, H.,

"417 East street.

"Witness: W. B. HAYWARD."

The defendants, Witzemann & Staiger, denied all the material allegations of the complaint, including the allegation that they executed the guaranty. But the court found for plaintiff, and rendered judgment accordingly for the full sum demanded. Witzemann & Staiger appeal from the judgment, and from an order denying their motion for a new trial.

Counsel for appellants contend that the finding that Witzemann & Staiger executed the guaranty is not justified by the evidence. The undisputed evidence shows that the guaranty was signed and delivered to Fox by W. B. Hayward, the bookkeeper of Witzemann & Staiger, in their absence, without their knowledge, and without authority in writing, or any express authority whatever. It is claimed by respondent, however, that, by their acquiescence, Witzemann & Staiger impliedly ratified the execution of the instrument by Hayward; and whether he did so, as to plaintiff's assignor, Smith,

is the principal question. "It is the general rule that the act of ratification must be of the same nature as that which would be required for conferring the authority in the first instance." If written authority is required by the statute of frauds, the ratification must be in writing (Mechem on Agency, sec. 136) ; otherwise, the statute of frauds may be evaded. And the only cases constituting exceptions to this general rule (if even they may be called exceptions) are those in which, although the assumed agent had no original authority, the alleged principal is estopped from denying such authority by reason of his acquiescence, acts, or words indicating ratification, upon which others have relied and acted in good faith and with ordinary care. These are causes of implied or ostensible ratification, to which the·principle of estoppel in pais is applicable on the same grounds as to cases of original ostensible authority. In both these classes of cases the effect of the estoppel is equivalent to conclusive proof of original authority (Mechem on Agency, sec. 107) ; and the authority thus established by an ostensible ratification is an ostensible authority in the sense of section 2334 of the Civil Code, which is as follows: "A principal is bound by acts of his agent, under a merely ostensible authority, to those persons only who have in good faith, and without ordinary negligence, incurred a liability, or parted with value, upon the faith thereof." Conceding that the conduct or acquiescence of Witzemann & Staiger was such as to justify a finding of the ostensible authority of Hayward to execute the guaranty (which is doubtful), did Smith—plaintiff's assignor—part with his goods, relying in good faith upon such authority, and without ordinary negligence on his part? Smith commenced selling to Fox the goods sued for on June 1st, and before the execution of the guaranty had sold him goods to the value of over $100. Smith and his clerk, Murray, testified that credit for these goods was given because they had been informed that Fox could not take his position of steward without having given a bond to the railroad company "for the faithful performance·of his duties." The agreement with Fox was that he should pay Smith on the 15th of each month. On the last day of June the bill, then amounting to $237, was presented to Fox, who failed to pay it. Smith then refused him further credit, and presented his bill to the rail-

road company, whose agent told him that "Fox was under bonds to pay the bill himself, and they didn't wish to have anything to do with it," but if he would get an order from Fox they would pay the June bill. On July 3d Smith asked Fox for an order on the railroad company, but he indignantly refused to give it, saying he would pay his bills on July 15th, or that his bondsmen would. He then showed Smith a copy of the bond he had given the railroad company. As to this Smith testified: "That was on the 3d day of July, I believe. I had refused to give him (Fox) any more goods at that time. On the strength of that bond I continued giving him goods until the 15th of July." On July 15th, for the first time, Smith called on Witzemann & Staiger, at their place of business, to inquire whether they were responsible for Fox's bills. Of this he testified: "I saw Mr. Staiger. . . . . Introduced myself to him. Told him who I was. . . . . Told him I was supplying goods to a man by the name of Fox, on the steamer 'Donahue.' Asked him if it was all right,—whether he would pay the bill when it became due. . . . . I gave him to understand that I would rely upon that bond. I said to him . . . . that I considered the matter safe as long as they were on the bond, and that was all I wanted to know—if Fox was short, that they would make it good. He made no response, but he was passing from the street at the time. He shook his head in an affirmative manner, although he made no response." It appears that Fox absconded on that day (July 15th), and that Smith sold him no goods after July 13th. On cross-examination, Smith said: "I never went to see Staiger or Witzemann . . . . at any time prior to July 15th. I first went to see the railroad company on the 3d of June. . . . . I did not ask to see the bond at the railroad company's. . . . . He (Fox) showed me the bond, and I told him all right; go ahead; that it was a good bond, provided it was genuine. . . . . The one I saw was a typewritten copy, with written signatures, with the letter 'H': 'Witzemann & Staiger. H.' . . . . I had seen the signature of the firm, perhaps. Couldn't say that I recognized it. I should suppose, from the letter 'H,' that it was not signed by the firm. The reason I did not go and see Staiger when I saw that the bond was not signed by the firm was that I was very busy, and hadn't time to go at once. I should have done so, of course,

but I delayed from time to time, thinking that, as long as I got there (at the railroad office) before he (Fox) drew any part of his money, that he couldn't get it, and that I was safe. . . . . . I accepted his assurances that the bond was genuine for the time being, excepting, however, that before the money was paid over, during the next month, I would see for myself. I had never been accustomed to dealing with this class of bonds before. . . . . . I think it is a little out of the regular course for this company to do this sort of business. It was a new arrangement with them, perhaps." Upon re-examination he said: "I had seen nothing about the bond that aroused my suspicion in regard to it. I simply wished to go and see Witzemann & Staiger to confirm its genuineness. . . . . I never talked with Mr. Hayward about the bond previous to July 15th."

Martin Murray, who, to say the least, seems to have been somewhat reckless in his statements, testified that he was employed in Smith's Cash Store during the months of June and July, and knew when Fox commenced to buy goods from that store for his restaurant on the steamer "Donahue"; that about a week after he commenced buying, Fox "brought in a copy [of the bond] into the store [it was not signed until a week later], and, knowing the man was devoid of veracity, I didn't take any interest in his statement, and I advised Mr. Smith to go and see Mr. Whiting; and I, in the meantime, consulted with the members of the Ocean Market [Witzemann & Staiger]. I went down after he had purchased some stores. . . . . We took all precautions, both myself and Mr. Smith, as I told Mr. Smith he was dishonest. . . . . . Mr. Smith saw Mr. Whiting, and I saw Mr. Staiger. 'Well,' I says, 'Mr. Staiger, I understand,' says I, 'that you are on the bonds of Mr. Fox.' He says, 'Yes.' Says I, 'Well, now,' says I, 'what am I to understand by that bond?' 'Well,' he says, 'we have given security for all the goods delivered upon that boat in the steward's department.' . . . . I told Mr. Smith exactly the words Mr. Staiger told me, and, as I said before, we took every precaution. . . . . We acted throughout with the understanding that Mr. Staiger was on the bond, and had also seen copies of it, . . . . and it was with that understanding that we sold the goods to Mr. Fox, as we did not consider him responsible. . . . . I know he owes me a hundred dollars from

another time. I know he came here from Australia. He left his wife there, and he has a very bad record.'' Being asked when he had the conversation with Mr. Staiger, above detailed, he again answered that it was seven or eight days after Fox commenced to purchase the goods. It appears that Fox ordered the first lot of goods on June 1st, and that it was delivered on June 3d; so that, if Murray's memory is reliable, his talk with Staiger must have been at least five days before the guaranty was signed. Mr. Staiger, however, denied having any such conversation with Murray, and further testified that he did not know that this firm's name was signed to the guaranty by Mr. Hayward until he was so informed by Mr. Smith on July 15th; that although he had been told by Hayward, about the last of June, that he (Hayward) had signed that bond, he understood him to mean that he had signed his own name, and not that of Witzemann & Staiger. Mr. Hayward testified: ''At the time I signed it, I thought it was a mere matter of form. . . . . It had been in my desk for two or three days. I knew Mr. Staiger had not signed it, but I didn't know why. I knew Mr. Staiger had told Mr. Fox, in my presence, that he would be willing to sign a bond. . . . . I assumed it would be all right for me to sign. I didn't speak of it to Mr. Staiger until some time afterward— I guess ten days or two weeks. . . . . When I did tell him I merely said I had signed that bond. That is all I said. I naturally supposed he knew I signed it in the name of the firm. I didn't go into any explanation particularly in regard to it. I supposed he thought so at the time.'' Mr. Staiger testified that he had promised Mr. Fox to sign the bond, provided he would get other sureties to go on it; but when Fox failed to get any other surety he refused to sign it, except on the condition that Fox would assign his salary as steward, in advance, as collateral security, which Fox had declined to do.

The court found that Witzemann & Staiger had no notice until July 15th that Smith was selling goods to Fox upon the faith of their guaranty, nor that Smith looked to them for payment in case Fox failed to pay. It is clear that Witzemann & Staiger are not liable for the goods sold to Fox before the guaranty was signed, as it is not retroactive. And from the testimony of Smith it seems quite as clear that he sold no

goods on the faith of the bond, as he calls it, until after the third day of July, 1889, prior to which $237.32 of the debt sued for had accrued. On July 3d, after having refused to give Smith an order on the railroad company, and after Smith's refusal to give him further credit, Fox first showed Smith the bond, for the purpose of inducing the latter to extend his credit. It was then, for the first time, that Smith claims to have given Fox credit "on the strength of that bond." It is true he testified that when Fox bought the first lot of goods he said he was to give a bond, but he also said at the same time that the bond had not been drawn up. The circumstances that he did not notify Witzemann & Staiger between the 1st and 3d of July, after Fox had refused to give an order on the railroad company, that he looked to them as sureties, is inconsistent with the claim that he had sold goods to Fox on the faith of their guaranty before July 1, 1889; and there is no explanation of this plainly apparent inconsistency. But further, conceding, for the sake of the argument, that Smith relied upon the guaranty as security for all goods sold to Fox after its date (June 15th), the question remains, Did he rely upon it "in good faith, and without ordinary negligence"? If not, the plaintiff is not entitled to recover, since, as above shown, the execution and validity of the guaranty depend upon the "merely ostensible authority" of Hayward, the assumed agent, by which the principal is bound "to those persons, only, who have, in good faith, and without ordinary negligence, incurred a liability, or parted with value, upon the faith thereof." Ordinary negligence is the absence of ordinary care; "the failure to do what a reasonable and prudent person would ordinarily have done under the circumstances of the situation, or doing what such a person would not have done": Anderson's Law Dictionary. If Smith parted with his goods on the faith of the guaranty of Witzemann and Staiger, I think he did so without ordinary care, and consequently with ordinary negligence. In estimating the degree of care exercised by Smith, it should be noted, in addition to the evidence above detailed, that he was not a party to the guaranty, the principal object of which was to indemnify the railroad company. He was but one of a large, indefinite class of unnamed persons, who might have sold Fox goods on the faith of the guaranty to an amount,

for the price of which the guaranty, though properly executed, might have proved to be inadequate security. It should also be observed that Smith's Cash Store was but a short distance from the place of business of Witzemann & Staiger. To whatever extent Smith parted with his goods on the faith of the guaranty of Witzemann & Staiger, I think he did so without ordinary care, and, therefore, that the order and judgment should be reversed, and the cause remanded for a new trial.

We concur: Searls, C.; Belcher, C.

PER CURIAM.—For the reasons given in the foregoing opinion the order and judgment are reversed and the cause is remanded for a new trial.

DE HAVEN, J.—I concur in the judgment.